Filed 7/22/15  In re K.E. & A.P. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re K.E. & A.P., Persons Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT,<br><br>       Plaintiff and Respondent,<br><br>v.<br><br>SONIA E. and JOSE P.,<br><br>       Objectors and Appellants. | A143595<br><br>(Sonoma County Super. Ct. Nos. 3922-DEP, 3923-DEP) |

Appellant Sonia E. is the mother of dependent daughters K.E. and A.P.  Appellant Jose P. is the presumed father of A.P.  Both Sonia E. and Jose P. appeal from the orders terminating their parental rights according to Welfare and Institutions Code section 366.26.[1]  Sonia E. also appeals from the order denying her petition under section 388 to have the children returned to her custody.  We conclude the juvenile court did not abuse its discretion when it summarily denied Sonia's petition without conducting an evidentiary hearing.  We further conclude that substantial evidence supports the court's findings that K.E. and A.P. were adoptable, and that neither of the claimed exceptional circumstances that might prevent adoption was established.  Finally, we hold that any

---

[1]   Statutory references are to the Welfare and Institutions Code unless otherwise indicated.

1

noncompliance with the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq. (ICWA)) is waived in circumstances where neither parent made a timely protest and the child's Tribe participated at all stages of the lengthy dependencies—and concurred in the termination. In light of these conclusions, we affirm.

## BACKGROUND

In May 2012, respondent Sonoma County Human Services Department (Department) filed separate petitions in which it was alleged that by reason of her "propensity for substance abuse," Sonia E. was unable to protect and provide for K.E. and A.P., thus bringing them within the scope of section 300, subdivision (b). The same conclusion was alleged with respect to A.P. because of Jose P.'s "substance abuse problem." The children were promptly detained.

The combined jurisdictional and dispositional hearing was held in September 2012. The Department initially recommended that neither Sonia E. nor Jose P. receive reunification services, but it was sufficiently impressed with the progress made by the pregnant Sonia E. that it changed its recommendation. The reasons for this change were explained by the case worker as follows:

"Ms. E[.] has greatly surprised this writer by her expansive embrace of recovery principles, not only as verbalized but also as maintained in her behavior. She appears to have had a true 'awakening' as described in the AA Big Book, and to have acted upon it. The Big Book also refers to a complete reorganization of an individual's personality, such as is necessary to maintain recovery. Although much work remains to be done, especially when it comes to relationship patterns and choices, Ms. E[.] is clearly on this path. In particular, her lack of defensiveness and excuses is most unusual, and in stark contrast to her earlier behavior.

"This writer has never before changed a Recommendation of Bypass[2] to that of Reunification services, but Ms. E[.]'s progress is so exceptional that she is doing so now.

---

[2] "Bypass" appears to be a bit of shorthand jargon, meaning that a parent can be "bypassed," that is, denied reunification services, for one of the 16 reasons enumerated in subdivision (b) of section 361.5.

2

No one can foretell the future, of course, but this young woman may become one of the few who truly succeed in turning their lives completely and permanently around. This writer knows of several such 'success stories,' and, having witnessed it, knows that such can and do evolve from quite unpromising beginnings. Indeed, who would have predicted that a woman who had failed so many prior opportunities to enter treatment would have such dramatic growth in so short a period of time once she did?

"This writer has learned through hard experience that true, sustained recovery is a rarity. There are no guarantees, but she believes that Ms. E[.] has a shot at this. The writer now recommends Reunification services in as strong of terms as she originally recommended Bypass."

As for Jose P., the case worker initially informed the court: "Mr. P[.] has obtained work that prevents him from attending visits or DAAC [Drug Abuse Alternatives Center] classes as scheduled, and has not attempted to make alternative arrangements that would allow him to do so. (Note: DAAC classes are available in the evening for the convenience of those who work during the day, and this writer would have attempted to reschedule visits on weekends or at CPI in the evenings had the father requested it and let her know what his work schedule is.) However admirable and even necessary Mr. P[.]'s work ethic may be, it appears that he has made his choice, and that choice does not include custody of his child."

This too changed before the hearing. At the time she modified her recommendation for Sonia E., the caseworker said this about Jose P.: "Mr. P[.] has shown an interest in having a relationship with both girls, and is now participating in services. He appears to be in very early recovery and to have an incomplete grasp of basic recovery principles . . . and continues to externalize blame. The Department is pleased that Mr. P[.] has chosen to take advantage of services offered to him as in the best interests of the children, and funding is in place for DAAC treatment to continue within the normal parameters of Department funding. However and especially given his long history of addiction, past participation twice in residential treatment followed by

3

relapse, and minimal progress in the particulars of recovery beyond mere abstinence, this writer is not prepared to change her Recommendation of Bypass as to Mr. P[.]"

Neither Sonia E. nor Jose P. appeared at the hearing, and the court made a finding that "both parents have voluntarily absented themselves." Through counsel, both submitted on the social worker's report, although counsel for Jose P. disagreed with the dispositional recommendation. After argument was completed, and as the court was about to rule, Jose P. appeared. Following unreported discussions, the caseworker changed her recommendation as to him, too, so that he also was recommended for reunification services. The court then "revise[d] its previous finding that Mr. P[.] voluntarily absented himself," adopted the caseworker's modified recommendations that both parents receive reunification services, and set an informal "three-month oral update."

That update occurred in December 2012. Both Sonia E. and Jose P. were in court, and were congratulated by the court for their progress.

The six-month review was held in March 2013. Jose P. had "relapsed once during the review period," and "recently got laid off . . . but . . . he has been offered another job and will begin soon. He is participating in his case plan and engaging in services." Both he and Sonia E. were living with their respective families, he in Petaluma and she in Santa Rosa. The caseworker analyzed the status of the situation as follows:

"Before the Court are the matters of [K.E.] and [A.P.], two little girls residing with their maternal aunt. . . . At this time it is not clear if . . . Mr. P[.] and Ms. E[.] are in a relationship with one another as they seem to go back and forth. This is concerning to the undersigned because these girls need consistency and stability. Once both parents regain a deeper focus on the current services, the undersigned may refer them to couples counseling, but the undersigned would like to see them performing at a higher level and not missing visits before adding additional services only to find that it may be too much.

"K[.] and A[.] are precious young girls that deserve the sobriety of their parents and although Ms. E[.] and Mr. P[.] are participating in services, the undersigned is very concerned about Mr. P[.]'s relapse . . . and Ms. E[.]'s recent lack of participation in her

4

[drug treatment] Program. The Department is pleased that Mr. P[.] has chosen to take advantage of services offered to him as in the best interests of the children. Both parents need to stay strong, focused and dedicated to their recovery and keep in mind how hard they fought not to be bypassed on services. Despite the undersigned's reservations, there does appear to be substantial probability that the minors can reunify with their parents, however the time is very limited and although both parents have a fighting chance at reunification . . . they need to recommit themselves to services." The caseworker recommended Sonia E. and Jose P. receive six additional months of reunification services.

The formal six-month review was initially set for March 7, 2013, but it was continued a number of times for various reasons (including multiple settlement conferences), and was not actually held until August 5, 2013. Part of the delay was attributable to the Department in May changing its recommendation that Jose P. continue to receive reunification services due to his "continued lack of participation in services throughout the life of this case and particularly during this interim period."[3] Then in June, the Department also changed its recommendation as to Sonia P., so that now the Department was recommending that neither parent receive additional reunification services, and, moreover, "that this matter be set for a 366.36 hearing to determine a permanent plan for both children."

The August 5, 2013 hearing commenced with counsel for the Department informing the court: "Your Honor, although this is a contested hearing as to the 6-month review, in fact, this is a case in which the 12-month review has merged with the 6-month review, so we would ask the Court to deem this a 12-month hearing as well.

"And we do have a resolution, after much discussion and consideration by everyone, and it's been a complicated but, I think, fruitful process for us all.

---

[3] An apparent reference to the time after March 7, 2013, when the six-month review was initially scheduled.

5

". . . [T]he agreement has been—and, of course, everyone can confirm this independently, but I'll just set the stage here—that the Department will be continuing services to mother [Sonia E.], with regard to both [K.E. and A.P.], and setting this for an 18-month review on October the 17th, 2013. And services as to Mr. P[.] will be terminated with respect to [A.P.], which is the case in which he had services."

As explained to the court by counsel for the Department, Sonia E. was, in effect, put in a zero-tolerance regime: "With regard to housing, that in order to have that piece of the case plan deemed complied with, she would have to have more than a shelter . . . or . . . transitional housing." "[T]here were concerns that Mother has not been proactive in meeting with the Department's placement person" and "other [placement services], and she will have to be proactive to seek those out.

"Mother will also be required to go to therapy once a week, . . . and there have been some concerns about missed visits. There will be . . . no discussion about babies being sick, anything, she has to find a way to get there." Sonia E. was also required to "start parent education at CPI [Child Parent Institute]," and maintain visitation with all three of her daughters: "there won't be any leaving Carmen[4] behind and just having the two girls [i.e., K.E. and A.P.] . . . . [I]t is of paramount importance to determine mom's ability to have these children return, that she demonstrate her ability to . . . care for all three at once. These are young kids, and it's a handful, but that's what she signed up for." "Mother will have to strictly comply with her 301 case plan involving Carmen.[5] . . . [T]hat is of critical importance in assessing her progress."

"Mother will attend DDC [Dependency Drug Court] strictly, no excuses. If the baby [Carmen] is sick, then Mom comes, and she finds a place and someone to care for the baby. But although DDC apparently excuses parents when babies are sick, in this case, that's not going to be the rule."

---

4 This was the child born to Sonia E. during the dependency proceedings.

5 Section 301 authorizes that a caseworker "may, in lieu of filing a [dependency] petition . . . , and with the consent of the child's parent . . . , undertake a program of supervision of the child."

6

"Also, mother will be randomly tested by the Department for drugs." "Mother must demonstrate she independently can care for [K.E.]'s medical needs. . . . [including] a requirement that she attend [K.E.]'s medical appointments. She will have to find a way to get herself to those appointments. . . . [I]f mother cannot care for her, then there's no possibility of return. . . .

"I'm sure the Court can appreciate the concerns, . . . but there is just a little bit of time left, because the 18 months [the statutory maximum for reunification services] is in November. So this is 'pedal to the metal,' as we say and . . . this will be strict adherence. In October, there won't be any room for excuses."

The court agreed that the hearing would be treated as a 12-month review, and then heard concurrence from all parties. Yet counsel for K.E. and A.P. remained worried:

"[K.E. and A.P.] are very vulnerable little girls. [A.P.] just turned two years old. . . . She's in a critical period in her life. And as we know [K.E.] is five years old and was just diagnosed with a very rare, very serious condition.[6] And I do have to . . . thank the social worker for that, for her advocacy. I just spoke with the doctor this morning, and he indicated that if it hadn't been for the social worker's advocacy, they might not have found this. . . . [¶] But I'm very concerned. You know, it seems like the only thing that's been certain in this case has been uncertainty. And this mom has been given chance after chance after chance. . . . And each time, it seems like she does just enough to convince people that they should continue services to her. But there can't be any [more] wiggle room.

"The only reason that I'm submitting today is that, unfortunately, the girls' aunt, who they are living with, has indicated that she can no longer be a concurrent home, and

---

6   The condition, actually a number of ailments, is described in one of the Department's reports as follows:  "[K.E.] suffers from congenital pectus excavatum, as her chest cavity is severely caved in.  [She] has a restrictive and interstitial lung disease, pulmonary alveolar hemorrhage, asthma and is anemic.  Her most recent health issue that was discovered after several tests conducted at UCSF's Benioff Children's Hospital was a diagnosis of idiopathic pulmonary hemosiderosis, a rare lung condition in which . . . lungs can bleed, requiring immediate hospitalization and a blood transfusion."

so the girls are going to take some time to transition. . . . [¶] So this situation is very serious. We'll see how the next two months are in terms of compliance, in terms of taking this seriously, in terms of not hearing one single excuse, about one single missed visit or therapy appointment or DDC hearing or anything. There's just no room at all.

"These girls deserve better. They are actually going to require that mom do more than most parents, given their vulnerabilities, given their level of need. They're going to require a lot more of mom than otherwise. So I guess only time will tell."

Counsel for the Department closed the attorneys' remarks with a caution: "I think overlaying all of this is the need for mom to be absolutely transparent. There have been a number of areas where it's the Department's sense and belief that mother has not been straightforward. . . . [T]here is no room for anything but the absolute truth, and I would just encourage mom to realize that. Because, you know, that was one of the reasons it was a recommendation for termination. We cannot work with someone who is not being absolutely straightforward."

Before the court adopted the Department's proposed findings and orders, it addressed Sonia E.: "Mom, Sonia, you need to know that your attorney has, in some ways, performed a miracle here. . . . [¶] . . . I appreciate all of the hard work that's been done. It's taken over an hour, and that's . . . unusual. But I think it reflects the commitment the Department has shown to create reunification opportunities. The opportunity is there. Now it's up to you to deliver. They [counsel] have been very clear about what's expected."

On October 9, 2013, the Department submitted its Status Review Report for the 18-month review. Because Sonia E. had already received the maximum of reunification services, the Department was legally required to ask that no more be ordered. The caseworker reported both K.E. and A.P. "continue to reside with their maternal aunt in Santa Rosa," while Sonia E. and daughter Carmen reside at the Catholic Charities Family Support Center. The caseworker's recommendation, again, was that "this matter be set for a 366.26 hearing to determine a permanent plan for both children." The reasons were as follows:

8

"Ms. E[.] reports to the undersigned that she still has not followed up on the daycare referrals as she agreed to do at the last court review hearing on August 5, 2013. Carmen's 301 Voluntary Family Maintenance social worker . . . reported to the undersigned that Ms. E[.] informed her that she had followed up with the referrals but said there were no openings available. The undersigned called the Children and Family Circle childcare program on September 30, 2013 and was told that Ms. E[.] had not contacted their program to date in regards to securing a stable childcare for Carmen and that they do indeed have openings. In addition to the lack of follow through in regards to daycare for Carmen, [that] there continues to be inconsistency in Ms. E[.]'s communication with the various parties involved in this documented agreement at the last hearing is further concerning."

"Ms. E[.] missed DAAC/DDC services the week of September 30—October 4, 2013 due to Carmen's illness, further breaking her agreement from the last hearing that her DAAC/DDC attendance would be perfect and she agreed to have no excuses for absences."

"On August 19, 2013, the undersigned received a call from the caregiver of [K.E. and A.P.] who stated that Ms. E[.] reported that her visits were no longer supervised and to bring the girls to the shelter to visit over the weekend. The caregiver had not heard from the social worker of this change and would not allow this change to be implemented until hearing from the social worker directly. The undersigned returned the call of the caregiver and informed her that visits were to continue to be supervised and expressed the concern that Ms. E[.] was attempting to manipulate the caregiver."

"In regards to Ms. E[.]'s progress in individual therapy, Ms. Seibel has expressed concerns on multiple occasions to the undersigned that Ms. E[.] continues to bring her daughter Carmen to their sessions despite Ms. Seibel communicating that it is vital that Ms. E[.] come to sessions without Carmen. The undersigned communicated her concern that Ms. E[.] is using Carmen as a buffer to prevent her from examining deeper issues in therapy and Ms. Seibel expressed her agreement. Ms. Seibel reported that it is hard to work effectively during their sessions because she is constantly chasing Carmen around

9

the room. The therapist also reported that Ms. E[.] has arrived late to some sessions due to depending on others for rides. . . . She said Ms. E[.] has still not gotten the message that she cannot bring Carmen to sessions. Ms. E[.] simply cannot engage in therapy with . . . Carmen present."

". . . Ms. [E.]'s 301 Case Plan . . . requires her to get a Psychological Evaluation with Dr. Rodolfo Rodriguez which to date Ms. E[.] has still not followed through with. It is as if Ms. E[.] avoids being put to the test by her own design and is not cooperating with her 301 Case Plan."

"The undersigned directed Ms. Pena [of the California Parenting Institute] to observe Ms. E[.] and her ability to independently manage all three girls and recognize [K.E.]'s health issues. Ms. E[.] has voiced more concern and been more attentive to [K.E.]'s signs of health decline this review period, but rather than focusing on how to create sustainable means of transportation to attend [K.E.]'s appointments, many of which are at UCSF Children's Hospital, Ms. E[.] blames her family and accuses them of not properly caring for [K.E.]. . . . On September 19, 2013, after four visits with Ms. E[.], Ms. Pena reported that she is not seeing Ms. E[.] implement the [parenting] skills being taught and that she observed her being rather heavy-handed with Carmen and observed her showing Carmen some aggressive behaviors."

The Department had "identified a potential . . . home for both girls in which one of the care providers has [a] medical background."

The caseworker concluded:

"Ms. E[.] has continued to struggle balancing the high needs of her three active daughters combined with participating in her own services. Ms. E[.] has continued to be inconsistent in her communication and appears unable to be honest with the worker as she agreed at the last court hearing. Ms. E[.] has continued to struggle with her words and behaviors matching up and the undersigned predicts that Ms. E[.] will put the blame on the undersigned rather than take accountability for the consequences of her long-term substance abuse and lifestyle, both of which have affected her and directly her children. The undersigned has had many difficult conversations with Ms. E[.] in regards to the

10

myriad of responsibilities required to care for her daughters, while balancing daily living but Ms. E[.] has still not made the major changes needed to have her children placed with her and has continued to make excuses and blame the undersigned and her own family. Rather than Ms. E[.] taking advantage of the opportunity to trace back the issues that brought her to the attention of the Department and examining those issues deeply in her individual therapy and potentially take personal accountability for her past choices and trauma, within a safe and therapeutic setting, she has continued to blame outside forces. Given Ms. E[.]'s involvement with the Department since 2011, continued struggle managing all three children and serious concerns about her capacity to meet the health and safety needs of her children, the Department does not believe that there is substantial probability that [K.E. and A.P.] will be safely returned to Ms. E[.]'s care within the next review period. Therefore the Department respectfully recommends that Family Reunification Services be terminated as to the mother, Sonia E[.]"

The 18-month review set for October 17, 2013 was continued a number of times for, among other reasons, two more attempts at settlement, and commission of a bonding study at Sonia E.'s request.[7]

On February 10, 2014, reunification services to Sonia E[.] were terminated, and a permanent placement hearing set.

That final hearing was held on September 9, 2014.

Meanwhile, the previous month, the juvenile received a written request from Sonia E., pursuant to section 388, to change the order of February 10, 2014 that terminated her reunification services. The motion was largely based on the bonding study completed by

---

[7] "In a hearing to terminate parental rights in a dependency proceedings, the primary issue often is whether the parents can establish that the child would benefit from a continuing relationship with them and that termination of parental rights would therefore be detrimental to the child. (§ 366.26, subd. (c)(1)(B)(i).) In attempting to establish or eliminate this exception to the preferences for adoption, the parties or the court may require a bonding study to illuminate the intricacies of the parent-child bond so that the question of detriment to the child may be fully explored." (*In re S.R.* (2009) 173 Cal.App.4th 864, 869.)

11

Denise Wagner, Ph.D., a copy of which was appended to the request.  It was obviously not what Sonia E. expected.

Posing the question "What is the nature and quality of the relationship between [K.E.] and her mother, Sonia E[.]?", Dr. Wagner answered:  "K[.]'s relationship with her mother . . . has been unstable from very early in her life, when Ms. E[.] was absent from home for days, to weeks or longer.  These absences were so profound that at one reunion [K.E.] did not recognize her mother.  Much of the time she was present she was not in a state to be attuned to K[.]'s emotional needs.  K[.]'s behavior when with her mother at visits demonstrates an insecure attachment to Ms. E[.]  She is both angry with her mother while at the same time emotionally needy of her attention.  K[.] lacks a coherent strategy for getting her attachment needs met from her mother.  Ongoing regular contact between Ms. E[.] and K[.] feeds K[.]'s sense of insecurity and fear of abandonment and does not allow her to recover from her early trauma.  [¶]  K[.]'s needs for emotional stability, and predictability of a secure attachment are profound, especially in light of her serious medical condition.  Not feeling well, having to endure unpleasant, frightening treatments, including hospitalizations, is a tremendous burden for a young child.  The complexity of her medical and emotional needs requires a heightened degree of attunement on the part of the parent.  It is concerning to note that Ms. E[.], according to records and reports from [the caseworker], that Ms. E[.] rarely inquires about K[.]'s health."

To the same query about A.P., Dr. Wagner answered:  "A[.P.] has not resided with her mother since the age of 7 months.  Consequently, she has lived separately from Ms. E[.] most of her young life.  She appears to have weathered multiple placements quite well given her early instability.  In visits with Ms. E[.], her primary focus of attention is with her younger sister, Carmen.  While her interactions with Ms. E[.] are, for the most part pleasant, when visits are over she eagerly awaits the arrival of the foster mother, and is delighted to see her when she arrives."

To questions about the relationships of K.E. and A.P. with "the current guardians," Dr. Wagner stated:  "K[.] is building an attachment to her current guardians.  They have an understanding of the disease process as well as the psychological and emotional affect

being chronically and seriously ill has on K[.]  [¶]  She imagines a future with them, seeks comfort from them and spontaneously gives affection to them and receives affection from them openly.  Her tantrums, pouting, and nightmares have diminished as her sense of security is deepening in her care.  [¶]  They are very involved in her medical treatment."  "A[. P.] is developing a deepening attachment to the foster parents.  She is comfortable with them, regards them as parental figures, and spontaneously offers and receives affection with them. She shadows both foster parents in the home and desires to be with them.  Overall, A[.P.] appears to be surviving the instability of her infancy and earliest childhood experiences.  Her development and behavior are on target with her chronological age.  Her current placement provides her the security required to continue on this path."

Next was "What is the nature and quality of the relationship [K.E. and A.P.] have with Carmen P[.]?"  Dr. Wagner answered her own question as follows:  "Both [K.E. and A.P.] have an affectionate and loving relationship with Carmen.  This is especially true for A[.P.]  Carmen is the primary focus of A[.]'s attention during visits.  She refers to her as 'My Carmen.'  They play well together with little sibling rivalry.  When asking about upcoming visits, she asks about when she will see Carmen.  K[.] is affectionate with Carmen, but her main focus during visits is on getting her own needs met.  She is prone to jealousy when attention from Ms. E[.] is focused on either of her sisters."

Finally, as to "What is the Preferred Plan for [K.E. and A.P.]?", Dr Wagner concluded:  "Adoption is the preferred plan for both [K.E. and A.P.]  Continued contact should be thoughtfully and carefully planned, based on the needs of each child.  It would be beneficial, especially for A[.], to have some degree of continued contact with Carmen, which would necessitate some contact with Ms. E[.]  Such visits should be supervised and occur less frequently over time, to support the development of the children's primary attachment to the current guardians.  Whether or not visits are continued, the benefits of a permanent plan of adoption outweigh the detriments of severing the relationship each of them has with Ms. E[.]"

13

Asked on the Judicial Council motion form "Why would the requested order or action be better for the child or youth?", Sonia E. answered:

"Despite Dr. Wagner's recommendation for termination of parental rights, I feel we do have a parent-child relationship. It was I who sought answers when [K.E.] first showed signs of illness (see letter from Dr. Prystowsky). I completed my case plan; I am in recovery for 26 months. I have a job and I have separated myself from a relationship that was not serving either me or my children well (Jose P[.]).

"My former service providers (letters attached) spoke highly of me. I graduated from Dependency Drug Court. I NEVER relapsed from the time I entered residential treatment. I found myself being criticized for my parenting style—too authoritative; no affect; no sympathy.

"I think the description of my contacts with my two older girls in the Bonding Study shows how far I have come. I understand that evaluator feels the girls should be adopted out; I do want to point out that K[.E.] clung to me, wrapped herself around my leg, not wanting our first observed visit to end. Similarly, at the end of our second observed visit, K[.] hung on to me. I had to tell her, firmly, that we had to go. K[.] cried. (See Bonding Study, pages 11-13.)

"I also want to comment on the part of the Bonding Study where it states 'Ms. E[.], according to records and reports . . . rarely inquires about [K.E.]'s health.' Bonding Study page 15. That is simply not true; in fact, I was the one who kept bugging medical professionals to find out what was wrong with my child. Her disorder is very rare; in fact, K[.]'s primary care provider, Dr. Prystowsky, had never heard of it before. He calls it a common complaint with an unusual diagnosis. Anemia (iron deficiency) is common in families with low income. K[.] has severe levels (according to her doctor).

"For many months I joined in on doctor appointments while I was in reunification with the girls and they were placed with their maternal great-aunt (who did not want to keep them). The only reason I stopped attending was I was no longer informed of the days and times. I remember I was at UCSF on September 9, 2013 because K[.] needed a transfusion-like treatment. At that time I heard about several other appointments that I

14

didn't attend because I wasn't told. I am no longer allowed to attend her medical appointments.

"During reunification my mother experienced breast cancer; as part of her treatment, she had her breast removed. My sister lost her only son, Tony; he was a dwarf who had the highest level of ostiogenesis imperfecta (brittle bone disease). He wore a size 4T clothing and he was 13 years old. He died at his home; although CPS tried to say neither me nor my sister (his mother) took good care of him, that is not true. He died of natural causes, there was no foul [play] or medical neglect. It is unfortunate the girls were there when he passed away. I understand how it affected them, especially [K.E.]. She practically lived with my parents, my sister, and Tony for the first years of her life (when I was using drugs).

"I fought hard to get reunification services and I am not giving up. I care for my daughter Carmen very well; I had voluntary services for her after Tony died. My social worker was Melissa McKinney. When Tony died I did say I thought about relapsing but, I never did. I thought talking about it was better than stuffing down my feelings. I completed my case plan for Melissa. Carmen and I need [K.E. and A. P] to complete our family and I feel they both need us to complete theirs. Dr. Wagner writes about how both girls loved Carmen; [A.P.] and Carmen reached out for each other. She states that both [K.E. and A.P.] have an affectionate and loving relationship with Carmen.

"I want to raise my three children together; I think it is in [K.E.'s and A.P.]'s best interest."

Sonia E.'s Request was summarily denied on August 25. The stated grounds were that "The request does not state new evidence or a change of circumstances," and "The proposed change of order . . . does not promote the best interest of the child."

By the time of the permanent placement hearing the following month, the juvenile court had received the Department's "366.26 WIC Report." It informed the court that K.E. and A.P. "are currently placed in a confidential foster home; the foster parents have demonstrated interest in adopting the minors. The minors have been in the current placement since December . . . 2013." "After a thorough assessment . . . , the . . .

15

Department has determined the children are likely to be adopted and recommends parental rights be terminated and a plan of adoption be ordered."

The caseworker elaborated: "the current caregivers reported that [K.E. and A.P.] do not act out or display any abnormal behaviors after visiting with their mother. The undersigned asked the prospective adoptive mother if the children asked for their mother and she replied that they rarely ask for their mother but would often ask for their baby sister." "During this review period, neither [K.E. and A.P.] visited with their fathers. [¶] The assessment by the . . . Department includes consideration of WIC 366.26 (c)(1)(B)(i).[8] Although interaction between the minors and the mother may have some incidental benefit, such benefit does not outweigh the benefit they will gain through the permanence of adoption. The . . . Department finds that termination of parental rights would not be detrimental to the children."

K.E. "had her last physical exam in January 2014. [K.E.]'s medical issues continue to be stable and she has continued to respond well to her current treatment. . . . After diligent work from the Department, caregivers and doctors, it was arranged for the minor to receive her treatment at Memorial Hospital in Santa Rosa instead of traveling to San Francisco three consecutive days per month. [¶] . . . It is very important to note that [K.E.] receives this treatment (infusion of liquid prednisone) once a month and at times it

---

8   The cited provision provides in pertinent part: "(c)(1) If the court determines, . . . by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption . . . unless either of the following applies: [¶] . . . [¶] (B) The court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." Another exception is that "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).)

16

takes about 1.5 to two hours just to administer the treatment. The current caregivers reported that sometimes the days of treatment have lasted up to 7 hours . . . ."

"[K.E.] is currently receiving individual therapy through CPI. [K.E.] started individual therapy in . . . 2014 and is in the process of building rapport with her therapist. [K.E.] was referred to individual therapy given that she did not have the opportunity to process traumatic experience of witnessing her cousin dying. The undersigned believed it was imperative that [K.E.] have a chance to participate in individual therapy as a way for her to process her feelings of grief and loss. The current caregivers reported that at times [K.E.] tends to hit [A.P.] and appear to get easily irritable. They describe these behaviors to worsen in the days following her monthly medical treatment."

"[A.P.] had her last well child exam on or about February 19, 2014 . . . . The results of the evaluation revealed that [A.P.] is a healthy two-year-old." "[A.P.] has not been referred to therapy given her age and because [she] has not demonstrated any need for therapy. [A.P.] appears to have adapted well to her caregivers. She appears comfortable with the caregivers and often refers to them as 'Mami and Papi.' "

"The children currently visit with their maternal half-sibling [i.e., Carmen] every other week during the visits with their mother. The children appear to enjoy visiting their baby sister and the caregivers reported they tend to ask about Carmen."

The caseworker advised the court that the current caregivers, already a "certified foster home," were accepted by the Department as prospective adoptive parents, and an adoption home study was being completed. "The prospective adoptive parents are stable emotionally and economically. They have extensive years of experience with children in the Child Welfare System with diverse emotional, behavioral, physical and medical needs," and "appear committed to the permanency of these children."

"[K.E. and A.P.] appear to be developing a strong and healthy relationship with their prospective adoptive parents and would benefit from the establishment of a permanent parent/child relationship through adoption. They appear to be secure and comfortable in their current placement. The minors have been observed interacting with

17

the prospective adoptive parents in a loving manner. . . . [K.E. and A.P.] appear to have substantial emotional ties to the prospective adoptive parents."

The caseworker concluded: "It is important to note that [K.E.] has significant medical needs that must be met and the birth parents were not able to meet which led to her removal. It is crucial to have a clear understanding that [K.E.] continues to have high medical needs that require constant monitoring and regular medical appointments. . . . [¶] It is also important to mention that, while the mother has been able to care for her youngest daughter, it does not reflect [on] her ability to parent two additional children. It appears that the challenge and responsibilities that pose parenting a baby and two other children, including one with severe medical needs, are far beyond the mother's ability . . . . [¶] It is in the best interests of the minors that the legal relationship between the children and the parents be terminated pursuant to WIC 366.26 and that the children be placed in the care and custody of the . . . Department for adoptive placement."

Both Sonia E. and Jose P. were present at the permanent plan hearing. The only testimony came from Sonia E., and covered the same ground as the attachment to her request of the previous month. She testified that K.E. and A.P. are attached to her, call her either "Ma" or "Mommy," and would be adversely impacted if her parental rights were terminated. Asked why those rights should not be terminated, she replied: "[B]ecause I deserve a second chance to raise my kids. I missed out on so many years because of my addiction. And I'm present now. I'm stable. And I just want that chance to raise my kids, send them off to school, put them to bed, make them their meals, help do their homework." She asked the court to choose a guardianship instead of adoption as the permanent plan.

After hearing argument, the court ruled that "Dr. Wagner's analysis and conclusions seem, to this Court, to be well-founded, well thought out. And it carries, . . . especially under these circumstances, a great deal of weight with this Court. As such, the Court is going to adopt the [Department's] Proposed Findings and Orders."

**REVIEW**

**The Juvenile Court Did Not Abuse Its Discretion
by Summarily Denying the Section 388 Petition**

"Any parent . . . having an interest in a child who is a dependent child . . . may, upon grounds of change of circumstance or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order of court previously made . . . ." (§ 388, subd. (a)(1).) "If it appears that the best interests of the child . . . may be promoted by the proposed change of order, . . . the court shall order that a hearing be held . . . ." (*Id.*, subd. (d).) Such a petition may be summarily denied if the petition fails to make a prima facie showing of either a change of circumstances or how the proposed change would promote the best interests of the dependent. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 188–189.) A summary denial is reviewed according to the abuse of discretion standard. (*In re A.S.* (2009) 180 Cal.App.4th 351, 358.)

Sonia E., joined by Jose P., contends the juvenile court erred in summarily denying her "request" to set aside the order terminating reunification services. We do not agree.

In evaluating whether a parent has met the burden to show changed circumstances, the juvenile court should consider: (1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to both parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532.) These factors become less significant once reunification services have been terminated, as in the instant case. This is because, "[a]fter the termination of reunification services, . . . 'the focus shifts to the needs of the child for permanency and stability' [citation] . . . ." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

The basis for Sonia E.'s petition/request was her continuing to "have a parent-child relationship" with K.E. and A.P. This subject would have to be considered at the scheduled permanent planning hearing (see § 366.26, subd. (c)(1)(B)(i), quoted at fn. 8,

19

*ante*), particularly as it had been put in play by Dr. Wagner's bonding study. Thus, the petition/request was redundant and could be summarily denied on that basis alone. (See *In re B.C.* (2011) 192 Cal.App.4th 129, 142 ["The petition can only be described as superfluous; the petition sought a hearing on the very issue [that] would be considered at a hearing that had already been scheduled."].)

In addition, Sonia E. had already had 18 months of reunification services, the statutory maximum. (§ 361.5, subd. (a)(3).) Services had been terminated in February, almost six months before Sonia E. asked for their resumption. Sonia E. cites no authority allowing reunification services to be restarted beyond the statutory maximum in the same dependency. In short, Sonia E.'s request was for something which, if not legally impossible, was certainly beyond the court's discretion to grant. (See *Denny H. v. Superior Court* (2005) 131 Cal.App.4th 1501, 1509–1511 [" 'order extending reunification services [beyond statutory maximum] exceeded the court's jurisdiction.' "].)

Lastly, the request did not make a prima facie showing of changed circumstances. Sonia E.'s supporting attachment was quoted in full to demonstrate that it was a vehicle for her to dispute points in the bonding study and vehemently insist on her good intentions. There was nothing in it that was not already known to the court.

For each and all of these reasons, we conclude the juvenile court did not abuse its discretion with a summary denial. (*In re A. S.*, *supra*, 180 Cal.App.4th 351, 358.)

### The Finding That the Dependents Were Adoptable Is Supported by Substantial Evidence

"The court has four choices at the permanency planning hearing. In order of preference the choices are: (1) terminate parental rights and order that the child be placed for adoption (the choice the court made here); (2) identify adoption as the permanent placement goal and require efforts to locate an appropriate adoptive family; (3) appoint a legal guardian; or (4) order long-term foster care. (§ 366.26, subd. (b).) Whenever the court finds 'that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption.' (§ 366.26, subd. (c)(1).) The

circumstance that the court has terminated reunification services provides 'a sufficient basis for termination of parental rights unless the court finds a compelling reason for determining that termination would be detrimental to the child due to one or more' of specified circumstances. (*Ibid.*) The Legislature has thus determined that, where possible, adoption is the first choice. 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' [Citation.]" (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)

"In order for the court to select and implement adoption as the permanent plan, it must find, by clear and convincing evidence, the minor will likely be adopted if parental rights are terminated." (*In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1164; see § 366.26, subd. (c)(1), quoted at fn. 8, *ante*.) "Although a finding of adoptability must be supported by clear and convincing evidence, it is nevertheless a low threshold: The court must merely determine that it is 'likely' that the child will be adopted within a reasonable time." (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292.)

Adoptability is not necessarily a one-dimensional concept. Generally, "[t]he issue of adoptability posed in a section 366.26 hearing focuses on the *minor,* e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor." (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.) It is not necessary that the minor already be in a potential adoptive home, or that there even be a prospective adoptive parent. (*Ibid.*) This is what has come to be called "general" adoptability.

" 'If the child is considered *generally adoptable,* we do not examine the suitability of the prospective adoptive home. [Citation.] However, where the child is deemed adoptable based solely on the fact that a particular family is willing to adopt him or her, the trial court must determine whether there is a legal impediment to adoption.' [Citation.] [¶] . . . [¶] In other words, . . . 'in some cases a minor who ordinarily might be considered unadoptable [because of] age, poor physical health, physical disability, or emotional instability is nonetheless likely to be adopted because a prospective adoptive family has been identified as willing to adopt the child.' " (*In re I.W.* (2009) 180

Cal.App.4th 1517, 1526, italics added.) This is what has come to be called "specific" adoptability.

"All that is required is clear and convincing evidence of the likelihood that adoption will be realized within a reasonable time." (*In re Zeth S.* (2003) 31 Cal.4th 396, 406.) Additionally, the prospect that the minors may have some continuing behavioral or developmental problems does not foreclose a finding of adoptability. (See *In re Jennilee T.* (1992) 3 Cal.App.4th 212, 224–225.) Although the juvenile court must find by clear and convincing evidence that the child is adoptable, we review a finding of adoptability for substantial evidence. (*In re D.M.* (2012) 205 Cal.App.4th 283, 294, fn. 3; *In re E.B.* (2010) 184 Cal.App.4th 568, 578.)

Sonia E., again joined by Jose P., argues the finding of K.E.'s adoptability made by the juvenile court is not supported by substantial evidence. This claim is to be evaluated according to familiar principles: "On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) "[A]n appellate court does not reassess the credibility of witnesses or reweigh the evidence. [Citation.] . . . Thus, we must uphold the juvenile court's factual findings if there is any substantial evidence, whether controverted or not, that supports the court's conclusion." (*In re S.C.* (2006) 138 Cal.App.4th 396, 415.) The presence of prospective adoptive parents is substantial evidence of adoptability. (*In re Sarah M., supra,* 22 Cal.App.4th 1642, 1649–1650.)

By focusing only on K.E., Sonia E. is framing the issue as whether K.E.'s "specific adoptability" is supported by the record. It clearly is. K.E.'s demanding medical problems and needs were not a secret. The prospective adoptive parents had firsthand experience with them and were willing to proceed to adoption. That alone is substantial evidence. (*In re Sarah M.*, *supra*, 22 Cal.App.4th 1642, 1649–1650 ["the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating

22

to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*"].) The caseworker and Dr. Wagner knew of the difficulties in finding an adoptive family for K.E., yet both of them in their respective reports—both of which were received in evidence at the final hearing—believed she was adoptable. This is also substantial evidence. (See *In re Gregory A*. (2005) 126 Cal.App.4th 1554, 1561–1563, [caseworker's report was substantial evidence child was likely to be adopted]; *In re Jennilee T., supra,* 3 Cal.App.4th 212, 224 [opinion of caseworker was substantial evidence child was likely to be adopted].)

### The Juvenile Court's Determination That There Was No Exceptional Circumstance Preventing Adoption Is Sound

"Section 366.26 provides an exception to the general legislative preference for adoption when '[t]he court finds a compelling reason for determining that termination would be detrimental to the child' (§ 366.26, subd. (c)(1)(B)) because '[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).) The 'benefit' prong of the exception requires the parent to prove his or her relationship with the child 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' [Citations.] No matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life.' [Citations.] The relationship that gives rise to this exception to the statutory preference for adoption 'characteristically aris[es] from day-to-day interaction, companionship and shared experiences. Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship.' [Citation.] Moreover, '[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the

23

parent's rights will prevail over the Legislature's preference for adoptive placement.' [Citation.]" (*In re K.P.* (2012) 203 Cal.App.4th 614, 621.) A juvenile court's decision on this issue is also reviewed for substantial evidence. (*Id.* at pp. 621–622.)

Another exception to adoption is when "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26., subd. (c)(1)(B)(v).) "[E]ven if a sibling relationship exists that is so strong that its severance would cause the child detriment, the court then weighs the benefit to the child of continuing the sibling relationship against the benefit to the child adoption would provide." (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 952–953.) Accordingly "the application of this exception will be rare, particularly when the proceedings concern young children whose needs for a competent, caring and stable parent are paramount." (*In re Valerie A*. (2007) 152 Cal.App.4th 987, 1014.) And it must be kept in mind that "the sibling relationship exception permits the trial court to consider possible detriment to the child being considered for adoption, but not a sibling of that child. . . . '[T]he language [of section 366.26., subdivision (c)(1)(B)(v)] focuses exclusively on the benefits and burdens to the adoptive child . . . .' [Citation.] Nothing in the statute suggests the Legislature intended to permit a court to not choose an adoption that is in the adoptive child's best interest because of the possible effect the adoption may have on a sibling." (*In re Celine R., supra,* 31 Cal.4th 45, 54.) Thus, the inquiry is only about the detriment to K.E. and A.P. if the relationship to Carmen was severed.

"[T]he burden [of proof] is on the party seeking to establish the existence of one of the section 366.26, subdivision (c)(1) exceptions to produce that evidence." (*In re Megan S*. (2002) 104 Cal.App.4th 247, 252.) A juvenile court's determination that one or more

of the exceptions do not apply is also reviewed for substantial evidence.[9] (*In re L. Y. L.,* *supra,* 101 Cal.App.4th 942, 947.)

Choosing to see the issue through the abuse of discretion lens, Sonia E. and Jose P. assert that the juvenile court abused its discretion in concluding that neither exception applies to avert termination. We do not think the juvenile court was required as a matter of law to treat this case as sufficiently rare or exceptional to overcome the preference for adoption.

---

[9] Actually, the standard of review is somewhat unsettled. "For years California courts have diverged in their view about the applicable standard of review for an appellate challenge to a juvenile court ruling rejecting a claim that an adoption exception applies. Most courts have applied the substantial evidence standard of review to this determination [citations], although at least one court has concluded that it is properly reviewed for an abuse of discretion (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1351). Recently, the Sixth Appellate District has cogently expressed the view that the review of an adoption exception incorporates both the substantial evidence and the abuse of discretion standards of review. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315 (*Bailey J.*).) The *Bailey J.* court observed that the juvenile court's decision whether an adoption exception applies involves two component determinations: a factual and a discretionary one. The first determination—most commonly whether a beneficial parental or sibling relationship exists, although section 366.26 does contain other exceptions—is, because of its factual nature, properly reviewed for substantial evidence. (189 Cal.App.4th at p. 1314.) The second determination in the exception analysis is whether the existence of that relationship or other specified statutory circumstance constitutes 'a compelling reason for determining that termination would be detrimental to the child.' (§ 366.26, subd. (c)(1)(B); see *Bailey J.,* at p. 1315.) This ' "quintessentially" discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption,' is appropriately reviewed under the deferential abuse of discretion standard." (*In re K.P.,* *supra,* 203 Cal.App.4th 614, 621–622.)

But even the headsource for the abuse of discretion standard acknowledged that it can ultimately be seen as a matter of substantial evidence. "The practical differences between the two standards of review [substantial evidence and abuse of discretion] are not significant. '[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only " 'if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did.' " ' " (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)

25

By the time of the final hearing in September 2014, K.E. and A.P. had been living apart from Sonia E. and Jose P. for 29 months, ever since the minors had been detained in May 2012. During the course of the dependency it became increasingly clear that Sonia E. was unable to manage the care of all three of her daughters, and nothing in the record compels optimism of improvement should the four be reunified. Meanwhile, K.E. and A.P. were forming attachments and dependence upon their foster parents, getting the emotional stability they need. Dr. Wagner implicitly, and the caseworker explicitly (see text accompanying fn. 8, *ante*), each determined that the benefit the minors would gain from continuing a relationship with their mother was outweighed by what they gain from adoption. Their opinions constitute substantial evidence. And thus no abuse of discretion. (See *In re Jasmine D.*, *supra*, 78 Cal.App.4th 1339, 1351.) Sonia E. and Jose P. failed to carry their burden of demonstrating that they occupied parental roles for K.E. and A.P. who would thus be "greatly harmed" by termination. (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 853; *In re Derek W.* (1999) 73 Cal.App.4th 823, 826–827.)

What our colleagues in Division Three said in *Jasmine D.* is pertinent here:

"By the time of a section 366.26 hearing, the parent's interest in reunification is no longer an issue and the child's interest in a stable and permanent placement is paramount. [Citations.] 'In light of the earlier judicial determinations that reunification cannot be effectuated, it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home.' [Citation.] The child has a compelling right 'to [have] a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child.' [Citation.] Adoption is the Legislature's first choice because it gives the child the best chance at such a commitment from a responsible caretaker. [Citations.]

"The exception provided in section 366.26, subdivision (c)(1)[(B)(i)] must be considered in view of the legislative preference for adoption when reunification efforts have failed. [Citation.] So viewed, the exception does not permit a parent who has failed to reunify with an adoptable child to derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of

26

visitation with the parent. The . . . exception is not a mechanism for the parent to escape the consequences of having failed to reunify. That opportunity is provided by section 388, which permits a parent to petition for reconsideration of the reunification issue based on a finding of changed circumstances. [Citation.]" (*In re Jasmine D.*, *supra*, 78 Cal.App.4th 1339, 1348.)

We discern no basis for overturning the juvenile court's determination on the first of the exceptions.

With respect to the second exception, that termination would cause "substantial interference with a . . . sibling relationship" (§ 366.26., subd. (c)(1)(B)(v)), the answer is the same. Clearly there was a relationship between Carmen and her older sisters. Both the caseworker and Dr. Wagner noted the affection K.E. and A.P. have for Carmen.[10] But Carmen was born after K.E. and A.P. had been detained, so the three never lived together. They do not share "significant common experiences." (*Ibid.*) K.E. and A.P. see Carmen only when Sonia E. visits. There is no independent interaction. And Dr. Wagner and the caseworker each determined that the benefit the minors would gain from continuing a relationship with Carmen and mother was outweighed by what they gain from adoption. On this point also, their opinions constitute substantial evidence. And thus no abuse of discretion. On this point also, we discern no basis for overturning the juvenile court's determination that this was not one of the rare instances where the sibling bond was strong enough to overcome "the general rule that the court must choose adoption where possible." (*In re Celine R.*, *supra*, 31 Cal.4th 45, 53; see *In re L. Y. L.*, *supra*, 101 Cal.App.4th 942, 947; *In re Valerie A.*, *supra*, 152 Cal.App.4th 987, 1014.)

**There Was No ICWA Violation**

Concerning operation of the ICWA, this court recently stated:

---

[10] We note that the juvenile court was aware of the suggestion from our Supreme Court that "[w]hen appropriate, the court can encourage the adoptive parents to agree to visits among the siblings although, as the court recognized in this case, it cannot require them to do so." (*In re Celine R.*, *supra*, 31 Cal.4th 45, 55.)

27

"ICWA was 'the product of rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.' [Citations.] . . . [¶] . . . [¶] In the second section of ICWA, Congress declared it a national policy 'to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.' (25 U.S.C. § 1902.)

"Consistent with this policy, ICWA establishes procedural and substantive standards governing the removal of Indian children from their families. [Citations.] Our Supreme Court recently described these standards as follows:

" 'When applicable, ICWA imposes three types of requirements: notice, procedural rules, and enforcement. [Citation.] First, if the court knows or has reason to know that an " 'Indian child' " is involved in a " 'child custody proceeding,' " as those terms are defined in the Act [citation], the social services agency must send notice to the child's parent, Indian custodian, and tribe by registered mail, with return receipt requested. [Citation.] If the identity or location of the tribe cannot be determined, notice must be sent to the Bureau of Indian Affairs (BIA). [Citation.] No hearing on foster care placement or termination of parental rights may be held until at least 10 days after the tribe or BIA has received notice. [Citation.]

" 'Next, after notice has been given, the child's tribe has "a right to intervene at any point in the proceeding." [Citation.] "At the heart of the ICWA are its provisions concerning jurisdiction over Indian child custody proceedings. . . . [I]n the case of children not domiciled on the reservation: on petition of either parent or the tribe, state-court proceedings for foster care placement or termination of parental rights are to be transferred to the tribal court, except in cases of 'good cause,' objection by either parent,

28

or declination of jurisdiction by the tribal court." [Citation.] If the tribal court does not assume jurisdiction, ICWA imposes various procedural and substantive requirements on the state court proceedings. Indigent parents or Indian custodians have the right to court-appointed counsel. [Citation.] Before the court can place an Indian child in foster care or terminate parental rights, it must find "that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." [Citation.] A foster care placement also requires a finding, by clear and convincing evidence, based on testimony from "qualified expert witnesses," that "continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child." [Citation.] Before a termination of parental rights may occur, likelihood of harm must be proven beyond a reasonable doubt. [Citation.] Once the appropriate showing is made, ICWA establishes rules for the placement of an Indian child outside the home. "The most important substantive requirement imposed on state courts is that of § 1915(a), which, absent 'good cause' to the contrary, mandates that adoptive placements be made preferentially with (1) members of the child's extended family, (2) other members of the same tribe, or (3) other Indian families." [Citation.]

" 'Finally, an enforcement provision offers recourse if an Indian child has been removed from parental custody in violation of ICWA. Upon a petition from the parent or the child's tribe to "any court of competent jurisdiction," a foster care placement or termination of parental rights will be invalidated if the action was conducted in violation of ICWA.' [Citation.]" (*In re Autumn K.* (2013) 221 Cal.App.4th 674, 701–703.)

It has never been disputed that K.E. has Indian ancestry through her father and thus qualifies as an Indian child. (See 25 U.S.C. § 1903(4) [" 'Indian child' means any unmarried person under age eighteen and is . . . the biological child of a member of an Indian tribe"].) This was known from the start of the dependencies. The appropriate tribe was notified, and it formally intervened in June 2012, the month after the dependency proceedings commenced. And, from that point on, Percy Tejada, the tribe's

29

"ICWA specialist" and "Indian Child Welfare Manager," participated in the dependencies.

The Department was advised in the Department's reports that "Mr. Tejada has been actively involved in this case . . . and has also collaborated with the Department in regards to a permanent placement for K[.]," and that "Mr. Tejada presented K[.]'s case to the Tribe and there were no homes willing or able to care for . . . K[.]"

At the dispositional hearing, the juvenile court made the following findings: "There is clear and convincing evidence that active efforts were made to provide remedial services and rehabilitative programs to prevent the breakup of the Indian family and those efforts were unsuccessful.  [¶] . . . [¶]

"**ICWA Qualified Expert Testimony/Finding**

"There is clear and convincing evidence that continued custody with the parents is likely to cause serious physical or emotional damage to the children;

"As to K[.], the parties and Tribe have knowingly, intelligently and voluntarily waived the ICWA requirement that the Department produce expert evidence that continued custody with the parents is likely to cause serious emotional or physical harm to the child[ren]."

At the final hearing, counsel for the Department told the court that "Mr. Tejada," who was not present but was "aware of today's hearing," "has consistently indicated the Tribe supports the recommendation of adoption."  Among the findings made by the juvenile court at the final hearing was this:  "The child, K[.]'s, tribe was actively involved in the development of the case plan and plan for permanent placement, including consideration of whether tribal customary adoption is an appropriate permanent plan for the child if reunification was unsuccessful."

Notwithstanding this tribal involvement, Sonia E. and Jose P. discern a violation of ICWA.  Their initial argument is based on provisions of the ICWA[11] which they

---

[11]  "(d) Remedial services and rehabilitative programs; preventive measures.  Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide

30

interpret as requiring that the juvenile court "make specified findings before ordering an Indian child placed in foster care, or terminating parental rights." In addition to that federal statute, Sonia E. and Jose P. also point to a parallel state statute[12] which they construe as requiring expert testimony before either of those steps could be taken, and a rule of court governing the type and amount of evidence needed to remove an Indian

---

remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

"(e) Foster care placement orders; evidence; determination of damage to child. No foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

"(f) Parental rights termination orders; evidence; determination of damage to child. No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (25 U.S.C. § 1912(d)–(f).)

[12] "(a) Notwithstanding Section 361.5, a party seeking an involuntary foster care placement of, or termination of parental rights over, an Indian child shall provide evidence to the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

"(b) What constitutes active efforts shall be assessed on a case-by-case basis. The active efforts shall be made in a manner that takes into account the prevailing social and cultural values, conditions, and way of life of the Indian child's tribe. Active efforts shall utilize the available resources of the Indian child's extended family, tribe, tribal and other Indian social service agencies, and individual Indian caregiver service providers.

"(c) No foster care placement or guardianship may be ordered in the proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of a qualified expert witness, as defined in Section 224.6, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (§ 361.7.)

child.[13]  The claim is that the juvenile court did not have before it the testimony of a "qualified expert witness" concerning whether "active efforts" were made, and had no

___

[13]  "(a)  Evidentiary burdens

"In any child custody proceeding listed in rule 5.480, the court may not order placement of an Indian child unless it finds by clear and convincing evidence that continued custody with the parent or Indian custodian is likely to cause the Indian child serious emotional or physical damage and it considers evidence regarding prevailing social and cultural standards of the child's tribe, including that tribe's family organization and child-rearing practices.

"(1)  Testimony by a 'qualified expert witness,' as defined in Welfare and Institutions Code section 224.6, Family Code section 177(a), and Probate Code section 1459.5(b), is required before a court orders a child placed in foster care or terminates parental rights.

"(2)  Stipulation by the parent, Indian custodian, or tribe, or failure to object, may waive the requirement of producing evidence of the likelihood of serious damage only if the court is satisfied that the person or tribe has been fully advised of the requirements of the Indian Child Welfare Act and has knowingly, intelligently, and voluntarily waived them.  Any such stipulation must be agreed to in writing.

"(3)  Failure to meet non-Indian family and child-rearing community standards, or the existence of other behavior or conditions that meet the removal standards of Welfare and Institutions Code section 361, will not support an order for placement absent the finding that continued custody with the parent or Indian custodian is likely to cause serious emotional or physical damage.

"(b)  Standards and preferences in placement of an Indian child

"(1)  Unless the court finds good cause to the contrary, all placements of Indian children in any proceeding listed in rule 5.480 must follow the specified placement preferences in Family Code section 177(a), Probate Code section 1459(b), and Welfare and Institutions Code section 361.31.

"(2)  The court may deviate from the preference order only for good cause, which may include the following considerations:  [¶]  (A)  The requests of the parent or Indian custodian;  [¶]  (B)  The requests of the Indian child, when of sufficient age;  [¶]   (C)  The extraordinary physical or emotional needs of the Indian child as established by a qualified expert witness; or [¶]  (D)  The unavailability of suitable families based on a documented diligent effort to identify families meeting the preference criteria.

"(3)  The burden of establishing good cause for the court to deviate from the preference order is on the party requesting that the preference order not be followed.

"(4)  The tribe, by resolution, may establish a different preference order, which must be followed if it provides for the least restrictive setting.

written stipulation to that effect, and thus the court could not make the necessary findings that returning custody of K.E. was likely to result in serious emotional or physical damage to the child, that is, pretty much the identical findings it made at the dispositional hearing.

The Department responds that the argument was forfeited because neither Sonia E. nor Jose P. objected on these grounds in the juvenile court. This court does not recognize the reasoning of forfeiture in the context of ICWA's requirement of notice to the tribe "because notice serves the interests of Indian tribes, failure to give tribal notice is not an issue forfeited by a parent's failure to object." (*In re Z.N.* (2009) 181 Cal.App.4th 282, 296–297; see *In re Nikki R.* (2003) 106 Cal.App.4th 844, 849 ["The notice requirement is designed to protect the interests of the tribe; to the extent a notice defect impairs the tribe's ability to participate, another party cannot waive it."].)

---

"(5) The preferences and wishes of the Indian child, when of sufficient age, and the parent must be considered, and weight given to a consenting parent's request for anonymity.

"(6) When no preferred placement is available, active efforts must be made and documented to place the child with a family committed to enabling the child to have visitation with 'extended family members,' as defined in rule 5.481(a)(4)(A), and participation in the cultural and ceremonial events of the child's tribe.

"(c) Active efforts

"In addition to any other required findings to place an Indian child with someone other than a parent or Indian custodian, or to terminate parental rights, the court must find that active efforts have been made, in any proceeding listed in rule 5.480, to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family, and must find that these efforts were unsuccessful.

"(1) The court must consider whether active efforts were made in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's tribe.

"(2) Efforts to provide services must include pursuit of any steps necessary to secure tribal membership for a child if the child is eligible for membership in a given tribe, as well as attempts to use the available resources of extended family members, the tribe, tribal and other Indian social service agencies, and individual Indian caregivers." (Cal. Rules of Court, rule 5.484.)

33

That said, no issue concerning the adequacy or efficacy of the notice to the tribe is, or could be, presented here. K.E.'s tribe intervened virtually at the start of the dependencies and thereafter participated fully. At best, all Sonia E. and Jose P. are in essence arguing is that what was done at the dispositional hearing should have been done at the permanency planning hearing. Assuming for the sake of argument that this is true, that omission strikes us as precisely the type of error that could be corrected promptly if brought to the attention of the trial court, the very purpose of the forfeiture rule: " '[A] reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court. [Citation.] The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected. [Citation.] [¶] Dependency matters are not exempt from this rule.' " (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. omitted.) The error does not implicate so fundamental an interest as tribal notice, given that the tribe was fully involved. The error would not have been onerous to correct, particularly as the tribe fully concurred with the Department's recommendations. In these circumstances, we hold that it is not contrary to the purposes of the ICWA to apply the forfeiture rule. And for the same reasons, if the merits were preserved for review, we would also conclude that the error was harmless according to any standard for prejudice. (See *In re G.C.* (2013) 216 Cal.App.4th 1391, 1397–1401; *In re Riva M.* (1991) 235 Cal.App.3d 403, 411–413.)

## DISPOSITION

The orders are affirmed.

_____

Richman, J.

We concur:

_____

Kline, P. J.

_____

Miller, J.

A143595, *In re K.E. and A.P.*